FILED
2017 Mar-28  PM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EDDIE VAUGHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO.:**_____ |
| **THE LINCOLN NATIONAL** | ) | |
| **LIFE INSURANCECOMPANY ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Eddie Vaughan, and hereby files his Complaint against Lincoln Life and Annuity Company of New York.

## PARTIES

1.      The Plaintiff, Eddie Vaughan is an insured under The National Security Group Inc. Group Long-Term Disability Insurance Policy ("LTD"), Policy No. 000010145366 and The National Security Group Inc. ("WOP"), Policy No. 000010145365, (collectively, "the Plan").

2.      Defendant, Lincoln Life and Annuity Company of New York Company ("Lincoln") is the Administrator for the Plan issued to The National Security Group Inc. that has improperly denied owed benefits to Plaintiff.  Upon information and belief, Lincoln is a foreign corporation incorporated in the State of New York, which conducts business generally in the State of Alabama and

specifically within this District.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights and statutory violates of ERISA under 29 U.S.C. §1132.  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131.  Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The Plaintiff in this case was subjected to utterly reprehensible claim handling procedures by Lincoln as they exploited the shortcomings of ERISA as it relates to claims for "welfare" benefits to avoid paying Mr. Vaughan's valid claim for disability benefits.  The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Mr. Vaughan, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciaries.  Instead, the Defendant has breached those duties and victimized Mr. Vaughan by engaging in utterly reprehensible claim handling procedures.  As described in more detail below, the Defendant has clearly

engaged in bad faith claim handling and Mr. Vaughan, at minimum, is patently entitled all relief that ERISA provides.

## STATEMENT OF FACTS

5.     Mr. Vaughan ("Plaintiff") is an insured for benefits under The National Security Group Inc. Group Long-Term Disability Insurance Policy ("LTD"), Policy No. 000010145366 and The National Security Group Inc. ("WOP"), Policy No. 000010145365, (collectively, "the Plan"), sponsored by his employer, The National Security Group Inc.   Lincoln ("Defendant") is the administrator of the policy. (*See* Group Benefit Plan, attached hereto as Exhibit "A").  The Plan provides insureds like Mr. Vaughan long-term disability benefits and wavier of premium benefits for his life policy.

6.     Mr. Vaughan worked as the Marketing Director for The National Security Insurance Company until his disabilities forced him to stop working on or about January 13, 2014.

7.     Mr. Vaughan's medical disabilities include ependymoma of the brain, chronic peripheral neuropathy, diabetes, frequent nausea with vomiting, pain in his limbs, ventral hernia, and constant fatigue and weakness due to side effects from his tumor removal. Mr. Vaughan also takes medications prescribed by his treating physicians with side effects that cause fatigue and affect his concentration and ability to perform tasks.  The symptoms of his conditions render Mr. Vaughan

completely unable to perform any work.

8.     Mr. Vaughan had surgery on January 14, 2014, in order to remove the tumor that was pressed against his brain stem. Dr. Samuel Bowen, who had treated Mr. Vaughan since December 2013, noted that he had a history of nausea and vomiting, and headaches. An MRI pre-op showed a brain mass in the fourth ventricle; Dr. Bowen noted that recovery from the surgery alone would take twelve weeks.   (*See* Exhibit "B" Dr. Russell Bedsole Note from January 8, 2014; Surgical notes from Dr. Bowen, dates January 13 and 14, 2014).

9.     Post surgery, Mr. Vaughan experienced aspiration that required him to have a feeding tube; his headaches also continued. Dr. Russell Bedsole, Mr. Vaughan's internist, wrote to Lincoln on March 26, 2014 submitting his claim statement. He reported a chronic history of nausea and vomiting, lower extremity weakness and neuropathy. Dr. Bedsole remarked that Vaughan had lethargy, abdominal pain, and mild headaches at times. Mr. Vaughan's symptoms began five years ago; his brain tumor was not discovered until December 2013. Dr. Bedsole's restrictions noted difficulty walking, decreased strength in his lower extremities, unable to operate equipment, unable to lift heavy objects, or lift things above his shoulders. (*See* Exhibit "C" Note from Dr. Bowen dated January 29, 2014; Exhibit "D" Claim Statement from Dr. Bedsole, March 26, 2014).

10.     Mr. Vaughan's prognosis was reported unclear on the claim statement.

Dr. Bedsole reported continued lower extremity pain and edema as well as decreased strength in his legs. Dr. Bedsole states: "This is all due to his hospitalization for brain surgery, subsequent hospitalization for aspiration, and then subsequent hospitalization after that for malnutrition." The following restrictions were provided by Dr. Bedsole: he can sit for an hour, cannot stand or walk for an hour, and he is restricted on lifting, use of hands, use of feet, bending, squatting, crawling, climbing, and reaching above. He noted "there are restrictions in all of these due to decreased strength." (*See* Exhibit "D").

11.     Mr. Vaughan applied and was approved for long-term disability benefits from Lincoln beginning April 15, 2014 through April 11, 2016 under its own occupation provision.   Mr. Vaughan also applied for Social Security Disability benefits and was approved on June 1, 2014. The SSA found he was disabled as of January 10, 2014. (*See* Approval Letter from Lincoln and Notice of Award, attached hereto as Exhibit "E").

12.     Mr. Vaughan's condition has remained largely the same since his brain surgery and the complications it caused him. He falls quite often and has developed three compression fractures and bilateral hip pain as a result. These falls have been described as "ataxic", which suggests a neurological issue with muscle movement. (*See* Exhibit "F" New Patient Evaluation dated September 10, 2014). On September 23, 2014, Lincoln approved Mr. Vaughan for his Extension of

Death Benefit under his Group Life Policy and agreed to waive his premium payments. (*See* Exhibit "G" Letter from Lincoln September 23, 2014).

13.    Throughout 2014 Mr. Vaughan struggled with ambulating and walked with a cane. At a follow-up evaluation, Dr. David Woodham recommended considering a kyphoplasty in order to help his back pain. Mr. Vaughan's bilateral hip pain continued to persist, and was unresolved by bracing. Dr. Bedsole's Attending Physician Statement listed his physical impairments at a class four of "severe limitation of functional capacity; incapable of minimum sedentary activity".  Mr. Vaughan's mental impairments were listed at a class three meaning "patient is able to engage in only limited stress situations or engage in interpersonal relations". (*See* Exhibit "H" Treatment Records and Attending Physician Statement from Dr. Bedsole December 11, 2014, Treatment Records from Dr. Woodham dates October 2014 through November 2014).

14.    Mr. Vaughan's severe back pain and neuropathy continued to persist in 2015. On March 18th he visited Dr. Carey Holloway to follow up on the myriad of problems he has experienced since his surgery in 2014. Vaughan reported difficulty swallowing, issues with diabetes, and pressure in his back post epidural. On April 28, 2015 Dr. Bedsole noted that Mr. Vaughan had wheezing in his bilateral lung fields. Four months later, Dr. Bedsole confirmed that he still had an upper respiratory infection. (*See* Exhibit "I" Patient Visit Notes from Internal

Medicine Associates dated January 2, 2015 through August 19, 2015).

15.    Dr. Bedsole wrote a letter providing functional limitations for Mr. Vaughan on September 23, 2015. He restricted the maximum weight Vaughan can lift and carry occasionally at zero to ten pounds. Dr. Bedsole states:

> The patient may sit and stand frequently. He may walk occasionally. He may never climb. He may not bend/kneel. He may drive occasionally. He can  have frequent movements of hands. He can never have handling of foot  controls or reaching above the shoulders. There are environmental factors the patient should avoid including heavy dust or fumes. The patient continues to have decreased strength in his lower extremities,  and, therefore, cannot climb up steps well.
>
> ***
>
> The patient has had chronic and recurrent nausea and vomiting before we started seeing him several years ago. Eventually the patient underwent brain surgery due to ependymoma, which was located in the posterior portion of his brain. The  patient's ependymom surgery occurred in 2014. He has multiple conditions other   than that including diabetes. His  other chronic conditions include brain malignant  ependymoma, diabetes type 2, history of nausea and vomiting, now resolved, history of severe peripheral neuropathy, history of ventral hernia repair, history of   recurrent    upper respiratory infections, history of compression fracture of the    cervical vertebral body, history of abnormal LFTs, now resolving.

(*See* Exhibit "J" Letter from Dr. Bedsole dated September 23, 2015).

16.    By letter dated January 15, 2016, Lincoln terminated Mr. Vaughan's benefits beyond January 19, 2016 on the basis that he could perform his own occupation. Lincoln's denial stated that it agreed with Dr. Bedsole's "assessment of your restrictions and limitations giving you the functional capacity to perform in a sedentary capacity." Interestingly enough Dr. Bedsole's letter explicitly states: "His

present job, I do not believe, can allow for handling with impairment. At this point he is not able to return to work." (Exhibit "J"). (*See* Lincoln's Initial Denial Letter dated January 15, 2016 attached hereto as Exhibit "K").

17.     Lincoln's denial clearly fails to use its definition of own occupation in the policy by denying Mr. Vaughan based on his ability to perform sedentary work and not his own occupation which is properly categorized as light. The DOT Title Lincoln used to deny benefits, "MANAGER, DEPARTMENT (any industry), is too vague to serve as a proper description of Mr. Vaughan's duties. Mr. Vaughan's own occupation as Marketing Director for the National Security Group is more similar to a sales occupation. As a Marketing Director of an insurance company, Mr. Vaughan was  required to travel more than 30% of the time, which of course involved walking and ambulating to navigate airports, parking lots, rental cars, and hotel stays. Likewise, the claim job analysis submitted by his employer confirms that he is required to travel up to 50% of the time. The travel Mr. Vaughan was required to do in his own occupation clearly places him in the light category as defined by the Department of Labor 20 C.F.R. § 404.1567 (2017). Therefore, Lincoln improperly denied benefits in an attempt to miscategorize Mr. Vaughan's own occupation as sedentary. (*See* Exhibit "K"; Exhibit "L" Patient Visit Note from Dr. Bedsole dated April 4, 2016; Exhibit "M" Long-term Disability Claim Job Analysis and Code of Federal Regulations Physical Exertion Requirements).

18.    Five days after its erroneous denial of long-term disability benefits, Lincoln issued a letter to Mr. Vaughan denying his Waiver of Premium for extension of his death benefit under his life insurance policy. Lincoln claimed based on the same treatment records reviewed for his LTD, evidenced he was able to work in any occupation. Per the WOP policy the definition of disability for the WOP claim is as follows:

> "An insured person (1) is unable, due to sickness or injury, to engage in any employment of occupation for which such Insured Person is or becomes qualified by reason of education, training or experience; and (2) is not engaging in any gainful employment or occupation."

(*See* Exhibit "N" Denial Letter from Lincoln dated January 21, 2016).

19.    The ongoing symptoms as a result of Mr. Vaughan's brain tumor, bilateral neuropathy, back pain, and medication used to treat his symptoms clearly would preclude him from working in any occupation, much less his own. Prior to the WOP denial the treatment records from his physician's support his disabilities and show little improvement overall in his ability to ambulate, cognitive functioning, nausea, vomiting and back pain. (Exhibits "B", "C", "E", "G", "H"). Mr. Vaughan timely appealed both denials of his long-term disability and wavier of premium claims.

20.    In a letter dated January 29, 2016, Dr. Bedsole wrote to Lincoln regarding Mr. Vaughan's disabling conditions. The letter states at his last visit, Mr. Vaughan complained of dizziness, confusion, and stated cognitively his

functioning is "not as sharp as it once was".  Dr. Bedsole states: "It is my opinion that Mr. Vaughan has made progress overall in the last two years, certainly, but continues to have functional deficits, including memory issues at times and also some decreased ability to ambulate, as indicated by his reliance on a walking cane. I do not believe at this point that he has the functional capacity to perform his job duties, as outlined in the job description by his former company." Dr. Bedsole added "I am unclear as to what change could happen in the future. Further improvement could occur or may not occur. He may have reached a plateau at present given his neurological history...".  (*See* Letter from Dr. Bedsole attached hereto as Exhibit "O").

21.     Lincoln conducted a medical review of Mr. Vaughan's file on March 7, 2016. Once again, Mr. Vaughan's job is referred to as a Department Manager and "sedentary"; this is not accurate. Mr. Vaughan was a Marketing Director of an insurance company which required him to frequently travel and is properly classified as a light position. The reviewer, Arousiak Varpetian, spoke to Dr. Bedsole who stated "he can't do his old job where he was required to travel". (*See* Exhibit "P" Network Medical Review dated March 7, 2016).

22.     Despite recognizing the opinion of Mr. Vaughan's treating physician, Dr. Varpetian claimed that the medical evidence did not support restrictions since the issues were either stabilized with medication or otherwise resolved. The

medical records submitted by Mr. Vaughan clearly show his ability to ambulate has worsened since his surgery, he does have persistent loss of cognitive functioning, and his bilateral hip pain, and back pain have not resolved. Lincoln's medical reviewer ignores the weight of the medical evidence to come to its pretextual determination that Mr. Vaughan can work with only two restrictions of not working at heights or performing activities that require balancing. These restrictions do not even take into account the persistent pain and fatigue Mr. Vaughan experiences on a daily basis nor does it mention the explicit restrictions Dr. Bedsole provided for walking, standing, sitting, and especially not reaching over head. Dr. Varpetian's medical review is inept to say the very least. (Exhibit "P").

23.     Despite providing proof of his disability during the appeals process for both claims before the termination of benefits, Lincoln issued its second denial letter on March 11, 2016. For the third time Lincoln utilized the most generic Title from the Department of Labor, "Department Manager", to assert that Mr. Vaughan's own occupation is sedentary. The denial states "Jobs are sedentary if walking and standing are only required (1-33%) and if all other sedentary criteria are met". Lincoln's denial letter also completely fails to take into account Mr. Vaughan's fully favorable decision from the Social Security Administration and paid it mere lip service stating their decision is "independent" of the information

received by Lincoln. The denial letter fails to state specifically what information the SSA lacked or obtained that was different than the medical evidence it received for Mr. Vaughan's LTD and WOP claims. (*See* Exhibit "Q" Denial Letter from Lincoln dated March 11, 2016).

24.    Mr.  Vaughan's employer wrote a letter explaining his job responsibilities as the Director of Marketing for the National Security Group. The letter states:

> "Travel requirements were extensive. As a smaller company, the marketing support staff was limited and it was understood that the Marketing   Director's position would be a 'hands on' job requiring significant personal interaction."

The letter goes on to describe the Company's membership in various industry associations and the local community. Mr. Vaughan was required to attend meetings of the Association of the Alabama Life Insurance Companies as the Marketing Director and its President. Other national associations required Mr. Vaughan's attendance at various locations around the country. He also had several local events that required his participation. As mentioned, this type of travel is not properly categorized as sedentary and in fact makes Mr. Vaughan's own occupation light in nature. Lincoln repeatedly attempted to use the incorrect exertion level in order to wrongfully deny benefits. (*See* Exhibit "R" Letter from The National Security Group dated April 15, 2016).

25.     Mr. Vaughan began attending rehab due to his ongoing issues with pain and ambulating. On initial evaluation the treating clinician noted that he presented with numbness and feet in his hands. The evaluation further states "the patient has difficulty with balance tasks and prolonged walking. He is a fall risk and does report stumbling on occasion, which is why he continues to use the cane." The Clinician also found neural impairment and a loss of protective sensation. (*See* Exhibit "S" Rehab Services Initial Evaluation/Examination dated March 16, 2016).

26.     Dr. Bedsole re-evaluated Mr. Vaughan's conditions on April 4, 2016. He noted continued symptoms of lower extremity neuropathy that burns and numbness in his feet. Mr. Vaughan was also found to exhibit a loss of balance and consistent with his prior reports, issues with memory loss. Dr. Bedsole once again opines that "I believe the patient cannot perform his job duties as described in his job description, especially if they entail a great deal of walking, traveling, etc, and the patient is using a cane with significant lower extremity neuropathy history, in addition to memory loss, generalized fatigue, chronic use of steroids, and other chronic medical conditions, including diabetes, etc." (Exhibit "L").

27.     Mr. Vaughan saw a neurologist, Hassan Kesserwani, on April 6, 2016. He notes that he has lost a lot of weight and is generally weak. Mr. Vaughan reported that he had difficulty getting out of chairs and experienced pain in his back, thighs, and numbness and tingling in his feet.  On August 16, 2016, Dr.

Kesserwani submitted a correction to his April note stating that he could not stand with his arms folded without assistance. He also stated that Mr. Vaughan has difficulty standing on his heels. (*See* Exhibit "T" Charts from Dr. Hassan Kesserwani dates April 6, 2016 and August 16, 2016).

28.     Dr. Bowen performed an MRI of Mr. Vaughan's brain on July 20, 2016. The MRI showed an abnormal collection of cerebrospinal fluid. Mr. Vaughan submitted a supplementary statement to Lincoln on September 20, 2015. He reported his symptoms as severe neuropathy, inability to walk or stand without assistance, persistent issues with vomiting, and an inability to go upstairs. (*See* Exhibit "U" Office Note from Dr. Bowen dated July 20, 2016 and Insured's Supplementary Statement dated September 20, 2015).

29.     Lincoln issued its final denial letter of Mr. Vaughan's claims on September 22, 2016. The final denial letter, like the previous letters, improperly categorized Mr. Vaughan's job as sedentary and completely ignored the fully favorable social security decision.   Lincoln's denial letters are riddled with attempts to "cherry-pick" the record for evidence that supports its termination and give little or no weight the plethora of evidence that supports Mr. Vaughan's disability.  (*See* Exhibit "V" Final Denial Letter from Lincoln).

30.     As of this date, Mr. Vaughan has been denied benefits rightfully owed to him under the Plan.  Lincoln's decision to terminate benefits under the Plan

policy was grossly wrong, without basis and contrary to the evidence.

31.    Mr. Vaughan has met and continues to meet the Plan's definition of disabled.

32.    Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Mr. Vaughan's claim as required by ERISA.   Instead, Defendant acted in its own pecuniary interests and violated ERISA by conduct including but not limited to the following: breaching its fiduciary duty to the Plaintiff; reviewing the claim in a manner calculated to reach the desired result of denying benefits; failing to properly consider and credit the medical opinions of Mr. Vaughan's medical providers; and failing to properly consider and credit the determination of the SSA.

33.    Upon information and belief, Lincoln evaluated and paid all claims under the Plan at issue, creating an inherent conflict of interest.

34.    Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Defendants or to any other entity who may have adjudicated Mr. Vaughan's claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of Plaintiff's benefits constitutes an abuse of discretion.

35.    Mr. Vaughan has exhausted any applicable administrative review

procedures and Defendant's refusal to pay benefits is both erroneous and unreasonable and has caused tremendous financial hardship on Plaintiff.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A. Defendant's Determination that Plaintiff does not meet the Definition of Disabled as stated in the Plan was both Erroneous and Unreasonable.

36.     Lincoln contends that Mr. Vaughan failed to meet the definition of Disability under both of its WOP and LTD policies. The applicable definition of disability under both policies is as follows:

The LTD Plan at issue states, in part:

Disability or Disabled means:

1.     During the Elimination Period, and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

2.     After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education nor experience will reasonably.

The Plan further defines Totally Disabled for Waiver of Premiums as follows:

"An insured person (1) is unable, due to sickness or injury, to engage in any employment of occupation for which such Insured Person is or becomes qualified by reason of education, training or experience; and (2) is not engaging in any gainful employment or occupation."

(*See* Exhibit "A").

37.     Defendant failed to properly evaluate the effect of Plaintiff's pain and fatigue on the ability to perform the duties of his own occupation, consistently applying the wrong level of physical demands throughout its review of this claim and completely failing to acknowledge the amount of travel required for that position.  In addition to suffering from constant pain, Mr. Vaughan still suffers from vomiting, nausea, diabetes, and  cognitive impairments would render him ineffective in any work environment, much less his own occupation.  Defendant primarily relied on the reports of one hired medical reviewer to ascertain that Mr. Vaughan could perform his own occupation at a sedentary category. The categorization of Mr. Vaughan's job as sedentary is wrong and the findings are contrary to the opinions of his treating physicians.  Furthermore, the paid medical reviewers never examined Mr. Vaughan.  Accordingly, Lincoln's contention that Mr. Vaughan failed to prove that he was disabled under the LTD Plan must be rejected as Lincoln's decision to deny Plaintiff's benefits necessarily imposed a standard that was not required by the LTD Plan's provisions.  See *Soucy v. First UNUM Life Ins. Comp.*, 2011 U.S. Dist. LEXIS 27938*89-90.

**B.     Defendant's Decision to Terminate Plan Benefits Was Not Supported By Substantial Evidence.**

38.     Lincoln wrongfully chose to give little weight to credible medical evidence from Mr. Vaughan's treating physicians.

    1.    <u>Lincoln's Reliance on Paper Reviews and a flawed Job</u>
                <u>Description to Deny Benefits was Arbitrary and ——Capricious.</u>

39.    Mr. Vaughan's claim file is replete with medical records from his treating physicians extensively detailing his limitations.   Mr. Vaughan's physicians' assessments, treatment and medications they prescribed and administered, demonstrate that Mr. Vaughan's diagnosed conditions and symptoms of those conditions are extremely debilitating.

40.    The records of Mr. Vaughan's long-standing medical providers, who have no stake in the outcome of the case, clearly evidence that he is disabled based on their numerous personal examinations, testing, and procedures.   Lincoln's conclusion that Mr. Vaughan was not disabled was based merely on hired reviewers' cherry-picked assessment of his medical records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002)(finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005)("[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

41.     Lincoln's denial letters acknowledge the opinion of Mr. Vaughan's treating physician, Dr. Russell Bedsole, that he is unable to work at his own occupation and his prognosis is uncertain to improve or change. Yet this opinion, formed from years of treatment, was arbitrarily dismissed in favor of the paid reviewers' opinions.

42.     In weighing the opinions of Mr. Vaughan's providers against those of the reviewers retained by Lincoln, the following factors should be considered: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual."  While *Nord* provides that it is not a requirement to adopt a per se rule to treat treating physicians' opinions with more weight than those of hired medical reviewers, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metro. Life Ins. Co.,* 2005 U.S. Dist. LEXIS

22810, 33 (N.D. Ga. Sept. 16, 2005); *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

43.     Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.  Clearly, in Mr. Vaughan's case, these decisions indicate that his treating physicians' evaluations should be afforded greater weight than the opinions of Lincoln's consultants.

44.     Accordingly, Defendant's termination of Mr. Vaughan's Plan benefits was not properly supported.

2.    Defendant's Failure to Properly Credit Mr. Vaughan's Well-Documented Subjective Complaints Was Arbitrary and Capricious.

45.    Admittedly, some of Mr. Vaughan's disabling impairments have subjective components; however, they have been diagnosed by his treating physicians based on his medical history, extensive testing, and physical examinations. Mr. Vaughan's medical records provided to Lincoln show a long history of chronic pain complaints and a myriad of other issues due to his brain tumor.  Mr. Vaughan was even referred by his long term treating physician to a pain specialist, due to the severity of his chronic pain and unsuccessful attempts at physical therapy. Well-documented subjective reports such as Mr. Vaughan's should be considered credible and given appropriate weight.

46.    In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D. Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints."

47.    An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.,* 35

F.3d 382, 387 (9th Cir. 1994); *see also May v. Metro. Life Ins. Co.,* 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan."); *see also Duncan v. Continental Cas. Co.,* 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective medical evidence" to support her disability claim).

48.      In *Creel v. Wachovia Corp.*, 2009 U.S. App. LEXIS 1733 (11th Cir. Fla. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel,* the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

*Creel* , 2009 U.S. App. LEXIS 1733 at *7.

49.     Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8.  Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

50.     Here, Mr. Vaughan provided both extensive objective and subjective evidence of his disabilities.   Mr. Vaughan's medical records contain well-documented complaints, of pain, weakness, fatigue, dizziness and cognitive impairment.   Accordingly, Defendant's decision to deny disability benefits was substantively unreasonable.

**C.     Defendant Unreasonably Failed to Properly Consider Mr. Vaughan's Non-Exertional Limitations and the Cognitive Requirements of "Any Occupation" as defined for WOP Claim.**

51.     As previously stated, the Defendant presumably found that Mr. Vaughan is capable of performing his own occupation which is light work.  (*See* Exhibits "J,M,O,P and U"). Lincoln not only applied the incorrect occupational level in assessing Mr. Vaughan's claim but discredited his cognitive limitations in assessing him for the ability to perform any occupation.   . In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006)*,* the Court stated*,* "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

52.     The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects

of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

53.     Mr. Vaughan's conditions stem from his brain tumor, and he continues to suffer from extreme fatigue.  It is well documented that his cognition was further affected by his malnutrition that occurred post op. (Exhibit "H", "N").

54.     All of Mr. Vaughan's treating physicians consistently supported his disability claim in both treatment notes and medical statements provided to Lincoln.  Plaintiff's secondary medical issues compound his primary problems and it was unreasonable for the Defendant to fail to properly consider the impacts of Mr. Vaughan's non-exertional limitations in its decision.

## D.     Defendants Failed to Adequately Justify Taking a Position Different from the SSA on the Question of Disability.

55.     In stark contrast to Lincoln's unsupported and erroneous decision, the Social Security Administration found Mr. Vaughan disabled. (*See* Exhibit "E").

56.     When considering whether a claimant is disabled under sections 216(i) and 223(d) of the Social Security Act, the agency must determine whether

the claimant has the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

57.    Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

58.    At step one, the agency must determine whether the claimant is engaged in substantial gainful activity (20 CFR 404.1520(b)).  If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, or work experience.  If the individual is not engaged in SGA, the analysis proceeds to the second step.

59.    At step two, the agency must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  If the

claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

60.    At step three, the agency must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

61.    Before considering step four, the agency must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).  An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite limitations form his or her impairments.

62.    Next, the agency must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work (20 CFR 404.1520(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  If the claimant is unable to do any past

relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

63.    At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the agency must determine whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.  If the claimant is able to do other work, he or she is not disabled. If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.

64.    Lincoln repeatedly requested updates on the status of Mr. Vaughan's application for Social Security Disability constantly, yet it did not even bother to consider the actual findings of the SSA in denying his benefits. Rather, Lincoln attempted to justify their contrary findings on the basis of difference in criteria, which qualifies as blatant disregard and a borderline breach of fiduciary duty. (*See* Exhibit "W" Letter from Lincoln dated June 17, 2014).

65.    Courts have determined that the Social Security Administration's disability decision should be a "significant factor" in the consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn v. MetLife (Metro. Life Ins. Co.)*, 461 F.3d 660, 669 (6th Cir. Ohio 2006). *See also Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless"). Even though a favorable

decision in a Social Security disability appeal does not make a claimant automatically entitled to disability benefits under an ERISA plan:  [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.  *Bennett v. Kemper Nat. Services, Inc.,* 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009).

66.    Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294-95(6th Cir. 2005).

67.    In *Darland v. Fortis Benefits Insurance Company,* 317 F.3d 516 (6th Cir. 2003), the Sixth Circuit held that a court should consider a favorable social security decision as evidence that an insurance company acted arbitrarily and capriciously by requiring a claimant to apply for social security, then ignoring the favorable social security decision. The Court explained:

> [I]t is totally inconsistent for Fortis to request that Darland apply for social security disability benefits, yet avail itself of that social security determination regarding disability to contend, at the same time, that he is not disabled. ... Though not directly applicable in this case, the

principles of judicial estoppels certainly weigh against Fortis taking such inconsistent positions.

317 F.3d at 530.

68.    The Eleventh Circuit examined the juxtaposition between a Defendant insurer's self-interested SSD benefit policy requirements and its failure to give a SSA decision appropriate weight in its own disability denial determination under that same policy. *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir. 2014). On appeal, the *Melech* Court described Defendant LINA's policy in that case as follows:

> To summarize, the Policy effectively requires all claimants to apply for SSDI [Social Security Disability Income] at the outset; if a claimant fails to do so, LINA can reduce her benefits under the Policy, if any, by the amount of SSDI LINA says she could have gotten. In the event that LINA decides to pay a claim, the Policy allows LINA to hold the claim open, at least with respect to the total amount LINA must pay, until the SSA reaches a final decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because--having decided to pay the claim--every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LINA, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "***that LINA had an obligation to consider the evidence presented to***

*the SSA.*" *Id.* at 666 (emphasis added). The Court went on to state that "in light of these openly self-interested efforts, ***we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.***" *Id.* at 674 (emphasis added).

69.     In the matter at hand, the Plan required Mr. Vaughan to apply for Social Security disability benefits and even threatened to reduce his benefits going forward using an estimate award until SSD benefits were awarded. Further, like the Defendant insurer in *Melech*, Lincoln here required Mr. Vaughan to agree to turn over SSD benefits to Lincoln up to the amount of any LTD benefits paid under the Plan and included a Reimbursement Agreement for him to sign in order to select the method of further disability payments. ( Exhibit "W").   Lincoln's decision to terminate Mr. Vaughan's benefits was, in light of these circumstances, particularly egregious.

## CAUSES OF ACTION

## COUNT ONE
## ERISA (Claim for Benefits Owed under Plan)

70.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

71.     At all times relevant to this action, Mr. Vaughan was insured under The National Security Group Inc. Group Long-Term Disability Insurance Policy

("LTD"), Policy No. 000010145366 and The National Security Group Inc. ("WOP"), Policy No. 000010145365, (collectively, "the Plan") collectively "the Plan", within the meaning of 29 U. S. C. §1002(7), and was eligible to receive disability and waiver of premium benefits under the Plan.

72.    As more fully described above, the refusal to provide Mr. Vaughan benefits under the Plan for the period from at least January 15, 2016 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA. Defendant's decision to deny Plaintiff benefits constitutes an abuse of discretion as its decision was arbitrary and capricious and not based on substantial evidence.

73.    Mr. Vaughan brings this action to recover benefits due to him and to enforce his rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.    The applicable standard of review in this case is the arbitrary and capricious standard;

2.    That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate arbitrary and capricious review;

3.    From at least January 13, 2014 through the present, Mr. Vaughan met

the Plan's definition of disabled;

4.      Defendant shall pay Mr. Vaughan all benefits due for the period from at least January 20, 2016 through the present in accordance with the Plan;

5.      Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.      Defendant shall pay Plaintiff's cost of litigation and any and all other reasonable costs and damages permitted by law;

7.      Defendant shall pay attorney's fees for Plaintiff's counsel;

8.      Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully Submitted,

*/s/ Peter H. Burke*_____
Peter H. Burke (ASB-1992-K74P)

*/s/ Jessica Ann Hayslip*
Jessica Ann Hayslip
(ASB-2464-E98L)

**OF COUNSEL**:
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Phone:    205-930-9091
Fax:      205-930-9054
pburke@burkeharvey.com
jhayslip@burkeharvey.com

*Attorneys for Plaintiff Eddie Vaughan*

33

**<u>PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:</u>**

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY
c/o The Prentice Hall Corporation System, Inc.
135 North Pennsylvania Street, Suite 1610
Indianapolis, IN 46204